# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ANGEL MEDINA, | Civil Action No. 16-2162 (SDW) |
| Petitioner, | |
| v. | OPINION |
| STEVEN JOHNSON, et al., | |
| Respondents. | |

**WIGENTON**, District Judge:

Presently before the Court is the petition for a writ of habeas corpus of Angel Medina ("Petitioner") brought pursuant to 28 U.S.C. § 2254 challenging Petitioner's state court murder conviction (ECF No. 1). Following an order to answer, Respondents filed a motion to dismiss the petition as time barred (ECF No. 6), which this Court denied. (ECF No 9). Respondents thereafter filed a response to the petition (ECF No. 11), to which Petitioner has replied. (ECF Nos. 14-16). For the following reasons, this Court will deny the petition and will deny Petitioner a certificate of appealability.

## I. BACKGROUND

In its opinion affirming Petitioner's conviction and sentence on direct appeal, the Superior Court of New Jersey, Appellate Division, summarized the factual background of this matter as follows:

> On September 3, 2004, the Essex County Grand Jury returned [an indictment], charging [Petitioner] with knowing or purposeful murder, in violation of [N.J. Stat. Ann. §] 2C:3-11a(1) and (2) (Count 1), unlawful possession of a weapon, in violation of [N.J. Stat. Ann. §] 2C:39-5(b) (Count 2), and possession of a weapon for

an unlawful purpose, in violation of [N.J. Stat. Ann. §] 2C:49-4(a) (Count 3).

The jury trial began on September 28, 2005[,] and continued for five more trial days. Testimony was completed on October 18th.[1] The trial judge charged the jury on October 19th. During the next three days, the jury deliberated and requested read-backs of both testimony and portions of the charge.

The jury returned on October 25th and continued its deliberations. At the end of the day, the jury sent the following note to the trial judge: "After four days of deliberations this jury cannot arrive at a unanimous decision, and all 12 jurors believe that further deliberations will not yield a different result." In response to the note, he excused the jurors for the day and directed them to return the next day at 9 a.m.

The following day, the trial judge gave the jury a supplemental charge about continuing their deliberations. After further deliberations and read backs, including the entire charge on the murder and possession for an unlawful purpose counts, the jury returned guilty verdicts on all counts.

The trial judge sentenced [Petitioner] to an extended term of 40-years, with a 35-year parole ineligibility, on the murder charge. He imposed a concurrent 5-year term on the unlawful possession count. The remaining count, possession of a weapon for an unlawful purpose, was merged with the murder.

The testimony at trial revealed the following facts relevant to [Petitioner's petition]. On December 31, 2003, Makisia Haskins and her boyfriend Yusef Battle went to the Club Elaganza in Newark. They arrived at the Club, which they described as being dark, crowded and with loud music playing, after midnight. After approximately ten minutes in the Club, Haskins saw people fighting and recognized [Petitioner] to be one of the people involved. Haskins became separated from Battle because of the fight, but ended up being escorted out of the building by the Club's security personnel, along with [Petitioner] and Battle.

Haskins and Battle left the Club in Battle's burgundy Honda Civic and drove to Battle's mother's house. After sitting outside the

---

[1] As the Appellate Division explained, there "was a hiatus in the trial because of a long weekend following October 6th and the trial judge's unavailability the following week." (Document 23 attached to ECF No. 7 at 3 n. 1).

house for a few minutes talking with Battle, Haskins went into the house and talked to Battle's sister. After Battle called her on the cell phone, she left the house and returned to the car, where she found [Petitioner] in the car with Battle.

Haskins described Battle as being a little upset and [Petitioner] as calm. They drove around with little conversation for less than an hour, going nowhere in particular. They eventually ended up at a store called King's Fried Chicken, which is referred to as the "Chicken Shack." Battle parked the car down the street from the store. [Petitioner] got out of the car and went into the store. Haskins saw him talking to people in the store. She could not see clearly into the store because the windows were "foggy." She described the lighting outside of the store as dark, but said that there was light inside the store.

Battle then moved his car to a spot on the street right in front of the Chicken Shack. After a few minutes, Battle got out of the car and went inside to get a soda for Haskins. A few minutes later, six or seven people, including [Petitioner] and Battle, came outside. Haskins then saw [Petitioner] and two other males arguing in front of the store. One was light-skinned and the other, the victim, was dark-skinned and wearing a "colorful hat." Haskins saw the light-skinned male trying to push [Petitioner] away, apparently to prevent a fight. The arguing continued for about five minutes.

According to Haskins, shortly before she heard a shot, [Petitioner] was face-to-face with the victim and only a few feet away from him. The other male grabbed [Petitioner], but then let him go. [Petitioner] started to walk closer to the victim. Haskins testified that she did not see the shooting itself.

After she heard the shot, Haskins turned towards [Petitioner] and saw the victim fall. [Petitioner] walked back to the car and got in. At almost the same time, Battle got in the driver's seat and they drove away quickly. Haskins testified that they drove away going about 70 mph and that [Petitioner] said he wanted to drive on the highway.

According to Haskins, [Petitioner] told Battle he wanted to stop at housing projects referred to as "Seth Boyden." Haskins' initial testimony was that she did not see anything in [Petitioner]'s hands while they were driving around. She was subsequently shown her statement to the police and then testified that she saw a gun fall out of [Petitioner]'s pocket, which [Petitioner] picked up from the

3

floor.  After they arrived at the projects, [Petitioner] got out, went into a building and came right back out again.

They then drove to the Ritz Hotel on the border of Newark and Elizabeth.  When they arrived at the hotel, [Petitioner] asked Haskins to go into the office and get a room.  After some reluctance, the clerk rented her a room.  Haskins used a fictitious name.  [Petitioner] also asked Haskins to request the clerk to make the check-in time an hour earlier than it really had been, but the clerk refused.  Haskins returned to the car and handed the room key to [Petitioner], who left the car.  Battle and Haskins then drove to Battle's mother's house.[]

Fermin Wilson[2] was a friend of the victim who was present at the Chicken Shack at the time of the shooting.  Wilson described the victim as being in a good mood and acting normally.  He knew [Petitioner] because they had grown up in the same neighborhood.  Wilson is a member of a gang known as the "Bloods," but testified that the victim was not a member.  Wilson believed that [Petitioner] knew that [Wilson] was a member of the Bloods.

Wilson saw [Petitioner] and Battle come into the Chicken Shack.  Wilson thought that [Petitioner] looked angry.  [Petitioner] said that he had been "jumped," presumably meaning at the Club.  According to Wilson, [Petitioner] had been jumped by members of the Bloods.  The victim and [Petitioner] then started arguing.  A third individual stepped between [Petitioner] and the victim to move the two men apart.

After the victim left the Chicken Shack with the third individual, [Petitioner] followed them outside.  Wilson, who had initially turned away from the front of the store, turned back towards the front windows in time to see [Petitioner] walk behind the victim and shoot him in the head.  [Petitioner] walked away and got into a red Honda Civic, which pulled away very quickly.  Wilson left the store and tried to help the victim, staying with him until the police arrived.

Battle's testimony concerning the preliminary events of the evening was similar to that of his girlfriend, Haskins.  Battle had known [Petitioner] for a few years.  Battle saw [Petitioner] and the victim arguing in the Chicken Shack.  After the victim and [Petitioner] left the store, he was talking to Wilson when he heard a

---

2 Wilson, who was apparently imprisoned for a parole violation at the time of his testimony, testified while wearing prison garb and shackles.  (*See* Document 34 attached to ECF No. 7 at 3).

gun shot. Upon hearing the gun shot, Battle ran to the car because he was concerned about Haskins. After [Petitioner] got into the car, Battle dove away quickly. They drove around for a little while, ending up at the Ritz Hotel.

Irena Suvhocka, an employee at the Ritz Hotel, testified that someone came to the hotel in the early morning hours on January 1, 2004, and asked to rent a room. Suvhocka was asked to stamp the check-in time one hour earlier than the actual time, but refused to do so.

Dr. Thomas A. Blumfeld, the medical examiner, testified that the victim had been shot in the back of the head. Based on the toxicology tests done, the victim had a blood alcohol level of 0.085 and an alcohol level in his stomach of 0.104 at the time of his death.

[Petitioner] called two witnesses, but exercised his right not to testify himself. Terrance Harris was inside the Chicken Shack on the night of the shooting. He testified that the windows of the Chicken Shack are "really blurry" and that one cannot really see through them. One of the investigating officers, who had testified for the State and was then called as a defense witness, testified on cross-examination that when the police entered an apartment to arrest [Petitioner], he started running and tried to jump out of a window.

(Document 23 attached to ECF No. 7 at 2-9).

Following his conviction and sentencing, Petitioner filed an appeal, with the Appellate Division affirming his conviction and sentence by way of a written opinion dated June 23, 2008. (*Id.*). Petitioner then filed a petition for a writ of certification, which the New Jersey Supreme Court denied on September 24, 2009. (Document 24 attached to ECF No. 7).

On December 18, 2008, Petitioner filed a petition for post-conviction relief. (Document 25 attached to ECF No. 7). That petition, however, was dismissed without prejudice on May 11, 2009. (*See* Document 34 attached to ECF No. 7 at 3 n. 3). Petitioner thereafter filed another petition for post-conviction relief on March 8, 2010. (*Id.* at 3).

Following an evidentiary hearing at which both trial counsel and Petitioner testified, that petition was denied on the merits on June 28, 2013. (Document 30 attached to ECF No. 7). In denying the petition, the PCR judge made the following factual and credibility findings regarding trial counsel's alleged failings:

> In this case, Petitioner asserts that his trial attorney (1) failed to keep him appraised of his case status[,] (2) did not provide him with discovery or other case materials[,] (3) did not discuss the State's witnesses and his trial strategy for those witnesses[,] (4) did not discuss with him "testimony that might have been elicited during the trial [if he had] chosen to take the witness stand on his [own] behalf[,]" (5) lacked overall trial preparation[,] and (6) failed to object to the State's witness, Wilson, testifying in prison garb.
>
> At the Evidentiary Hearing, [trial counsel Richard] Banas testified regarding each of these accusations. Points (4) and (6) are discussed separately in this opinion. With regard to keeping Petitioner appraised of his case status, Banas testified that he met with Petitioner daily during trial and more than two times outside of the courtroom. He also met with Petitioner's family members prior to and during the trial. Banas testified that as defense counsel in a homicide case, he represented Petitioner by presenting witnesses and discussing their respective testimonies with Petitioner. Petitioner was also actively involved in cross-examination strategies of the Prosecutor's witnesses. Moreover, Petitioner aided Banas with the jury's voir dire and offered personal letters written by . . . a married woman with whom Petitioner was having a relationship. Petitioner hoped [her] testimony would account for his whereabouts during the early morning hours of January 1, 2004. From those letters, Banas formulated a line of questioning that revealed inconsistencies with [her] testimony on October 6, 2005. The following day, [she] sought out the prosecutors to tell them that she picked Petitioner up from the Ritz Hotel the morning of the homicide. With input from Petitioner, Banas challenged the credibility of each of the State's witnesses. For instance, Wilson's friendship with Petitioner was questioned, the vantage point from where he observed Coleman's murder as well as conflicting statements regarding the color of Petitioner's alleged gun were also reviewed. Additionally, Banas cross-examined Reed and tried to argue that Reed's initial statement to detectives was unduly influenced. Banas also highlighted the fact that neither Haskins nor Battle accrued accomplice liability charges. Moreover, Banas claimed that he gave Petitioner discovery materials while he was in

custody.  Although he could not specifically recall the exact date, he also testified he gave Petitioner the Grand Jury transcripts.  The Court finds Banas' testimony on these points to be credible and negates these claims of Petitioner.

(Document 29 attached to ECF No. 7 at 13-14).  The PCR judge also found credible trial counsel's testimony at the hearing that he had discussed with Petitioner his right to testify on his own behalf, including the effect Petitioner's prior convictions would have on his credibility if he testified, and found credible trial counsel's testimony that he told Petitioner that the decision whether to testify was Petitioner's alone to make and that Petitioner made that decision initially before trial and once again when asked by the trial court whether he wished to testify.  (*Id.* at 18-19).  Petitioner appealed, and the Appellate Division affirmed on May 11, 2015, "substantially for the reasons expressed in [the PCR judge's] thorough and cogent written opinion," including the credibility and factual findings quoted above.  (Document 34 attached to ECF No. 7 at 12-15).  Petitioner filed a petition for certification, which was denied on January 29, 2016.  (Document 35 attached to ECF No. 7).  This habeas petition followed.  (ECF No. 1).

## II.  DISCUSSION

### A.  Legal Standard

Under 28 U.S.C. § 2254(a), the district court "shall entertain an application for a writ of habeas corpus [o]n behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  A habeas petitioner has the burden of establishing his entitlement to relief for each claim presented in his petition based upon the record that was before the state court.  *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013); *see also Parker v. Matthews*, --- U.S. ---, ---,132 S. Ct. 2148, 2151 (2012).  Under the statute, as amended by the Anti-Terrorism and Effective Death Penalty

Act, 28 U.S.C. § 2244 ("AEDPA"), district courts are required to give great deference to the determinations of the state trial and appellate courts. *See Renico v. Lett*, 559 U.S. 766, 772-73 (2010).

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for a writ of habeas corpus unless the state court adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). Federal law is clearly established for these purposes where it is clearly expressed in "only the holdings, as opposed to the dicta" of the opinions of the United States Supreme Court. *See Woods v. Donald*, --- U.S. ---, ---, 125 S. Ct. 1372, 1376 (2015). "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Id.* Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a determination of a factual issue made by a State court shall be presumed to be correct [and the] applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

**B. Analysis**[3]

---

[3] In addition to the claims discussed in full below, Petitioner attempts to raise in his petition three blanket claims for which he has not provided any factual basis separate from his claims which are discussed in full in this opinion. Specifically, Petitioner raises claims in which he asserts that his claims should not be barred on procedural grounds, that he should have received an evidentiary hearing on all of his claims, and that the state courts applied an improper standard by applying a

### 1. Petitioner's Jury Instruction Claims

Petitioner asserts that the trial court erred and denied him Due Process both in giving a flight charge which placed the onus upon Petitioner to explain his flight from the scene of the shooting, and in charging the jury as to murder and passion/provocation manslaughter in such a way as to suggest that the jury had to acquit Petitioner of murder before reaching the lesser included passion/provocation manslaughter charge, in violation of New Jersey state law. "[T]he fact that [an] instruction was allegedly incorrect under state law is not a basis for habeas relief." *Duncan v. Morton*, 256 F.3d 189, 203 (3d Cir.) (quoting *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991)), *cert. denied*, 534 U.S. 919 (2001). Thus, where a habeas petitioner raises a claim challenging a state court instruction, he will be entitled to relief only where "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Id.* (quoting *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)). That the instruction in question was "undesirable, erroneous, or even universally condemned" is insufficient in and of itself to warrant relief. *Id.* Only if, after reviewing the challenged charge in the context of the overall jury instruction and surrounding circumstances, the Court determines that the charge was so erroneous that it resulted in a violation of due process should Petitioner receive habeas relief. *Id.*

---

plain error analysis to his ineffective assistance claims, which is patently unsupported by the record and is in any event insufficient to warrant relief as all of his ineffective assistance claims are without merit for the reasons discussed herein. As it does not appear that an improper standard was used, as Petitioner does not appear to have been procedurally barred from raising claims in the state courts, and as Petitioner did receive an evidentiary hearing, it fully appears that these three claims, to the extent they are separate from the other claims discussed herein, are without merit. To the extent that they are not separate from Petitioner's merits claims, they are likewise insufficient to warrant habeas relief for the reasons discussed herein.

Turning first to the flight charge claim, the trial court gave the following jury instruction as to flight after instructing the jury that the burden was on the State to prove every element of the charged offenses:

> There has been some testimony in this case from which you may infer that [Petitioner] fled shortly after the alleged commission of the crime. The defense has suggested the following explanation: that . . . shots [were] fired, and that [Petitioner] left the scene with Yusef Battle. If you find [Petitioner]'s explanation credible, you should not draw any inference of [Petitioner]'s consciousness of guild from [Petitioner]'s departure. If, after consideration of all the evidence, you find that [Petitioner,] fearing that an accusation or arrest would be made against him on the charge or charges involved in this indictment[,] took refuge in flight for the purpose of evading the accusation or arrest, then you may consider such flight in connection with all other evidence in the case as an indication or proof of a consciousness of guilt. It is for you as judges of the facts to decide whether or not evidence of flight shows a consciousness of guilt, and the weight to be given such evidence in light of all the other evidence in this case.

(Document 7 attached to ECF No. 7 at 11).

Petitioner contends that this instruction shifted the burden onto him. The Appellate Division, however, rejected that claim on direct appeal, finding that the instruction given at trial mirrored the model jury charge on flight, and specifically contained language indicating that the jury, if it agreed with the explanation provided by the defense that Petitioner left with his friend who was fleeing the shots, was free to draw no inference of consciousness of guilt from Petitioner's flight. (*See* Document 23 attached to ECF No. 7 at 14). The charge thus did not shift the burden of proof, but instead permitted the jury to infer consciousness of guilt if it rejected the defense's argument and thus still required the State to prove facts showing that the reason for that flight was Petitioner's guilt rather than a response to the fear and flight of his friend and driver, Battle. The Appellate Division held that such a charge is entirely appropriate under state law, (*id.*), and similar charges are commonplace in the face of similar facts in federal prosecutions. *See, e.g., United*

*States v. Moorefield*, --- F. App'x ---, 2017 WL 1048057, at *2-3, 3 n. 15 (3d Cir. Mar. 20, 2017) (collecting recent Third Circuit cases upholding flight charges). Viewed in the context of the entire jury charge, including the charge specifically informing the jury that the burden was on the State to prove every element of the case and the facet of the flight charge placing the choice of which side to believe as to flight solely in the hands of the jury, it is clear that this flight charge was not so erroneous that it rendered Petitioner's trial violative of Due Process, and Petitioner is not entitled to habeas relief on this basis. *Duncan*, 256 F.3d at 203.

Turning to the murder jury charge, the trial court gave the following instruction as to when and how the jury should judge whether Petitioner should be found guilty of passion/provocation manslaughter rather than murder:

> The third element that the state must prove beyond a reasonable doubt to find [Petitioner] guilty of murder is that [Petitioner] did not act in the heat of passion resulting from a reasonable provocation. Passion/provocation manslaughter is a death caused purposely or knowingly that is committed in the heat of passion resulting from a reasonable provocation. Passion/provocation manslaughter has four factors which distinguish it from murder[: adequate provocation, actual impassioning of Petitioner by that provocation, lack of a reasonable period of cooling off time, and that Petitioner did not cool off]. In order for you to find [Petitioner] guilty of murder, the state need only prove the absence of any one of them beyond a reasonable doubt.

> [The trial judge then explained each of those four elements in greater detail].

> If you determine that the state has proven beyond a reasonable doubt that there was not adequate provocation, or that the provocation did not actually impassion [Petitioner], or that [Petitioner] had a reasonable time to cool off, or that [Petitioner] actually cooled off[; a]nd in addition to proving one of those four factors you must determine that the state has proven beyond a reasonable doubt that [Petitioner] purposely or knowingly caused death, or serious bodily injury resulting in death, you must find [Petitioner] guilty of murder. If on the other hand you determine that the state has not disproved at least one of the factors of

passion/provocation manslaughter, beyond a reasonable doubt, but that the state has proven beyond a reasonable doubt that [Petitioner] purposely or knowingly caused death, or serious bodily injury resulting in death, you must find him guilty of passion/provocation manslaughter.

(Document 7 attached to ECF No. 7 at 20-21).

After completing the rest of the jury instruction, including the jury charges for the weapons offenses Petitioner faced, the trial judge then described to the jury the verdict sheet to be used in recording their verdict:

To assist you in reporting a verdict I prepared a verdict sheet that you will have with you in the jury room. The verdict sheet is not evidence, it's merely a . . . document to assist you in recording your verdict. . .

. . . .

I'll go over the verdict sheet with you now. I sets up the title of the case and so forth.

[It b]egins with Count 1. Murder of Mutah Coleman purposely or knowingly. Not guilty or guilty. It says if you find [Petitioner] guilty of murder, then you move on to Count 2. If you find [Petitioner] not guilty of murder, then you will consider passion/provocation manslaughter as I have defined that[, m]ake a determination, not guilty or guilty.

If you find [Petitioner] guilty of passion/provocation manslaughter, then you move on to Count 2. If you found [Petitioner] not guilty of murder, and not guilty of passion/provocation, then you will consider aggravated manslaughter. Not guilty or guilty.

[The Court then described the portions of the sheet referring to the weapons offenses.]

(*Id.* at 27-28). Following several days of jury deliberations, and shortly before the verdict in this matter, the jury requested that they be reread the jury charge. The trial court gave the murder and

passion/provocation manslaughter charges again, but did not repeat the portion of the charge regarding the jury verdict sheet.  (*See* Document 23 attached to ECF No. 7 at 12).

Petitioner contends that the discussion of the jury verdict sheet implied to the jury that they should only reach the question of passion/provocation manslaughter *after* finding him not guilty of murder, which he contends violates state law.  When he raised this claim on direct appeal, the Appellate Division concluded that, while the discussion of the verdict sheet may have been somewhat misleading as Petitioner suggests, the trial court's instruction as to the murder and passion/provocation manslaughter was "correct and detailed."  (*Id.*).  The Appellate Division in turn concluded that the correct instructions in the main elements charge, coupled with the fact that this "correct and detailed" instruction was repeated shortly before the verdict, while the allegedly misleading verdict sheet language was not repeated, alleviated any chance that the jury was misled as to the correct means or order of determining whether murder or passion/provocation manslaughter was the correct charge.  (*Id.* at 12-13).  The Appellate Division found this to be especially true in a case such as this one where "there was little if any evidence presented . . . to support a finding of passion/provocation manslaughter."  (*Id.* at 13).

In the jury charge, the trial court specifically instructed that the jury could not convict Petitioner of murder without specifically finding that the State had proven that Petitioner's killing of the victim was not the result of passion or provocation sufficient to support a lesser manslaughter charge.  That charge was repeated to the jury shortly before the verdict was reached.  Likewise, the trial court specifically stated that the verdict sheet, and the order and way it presented the claims, was only meant to be used as a tool for recording a verdict, not as a trump over the detailed instructions already provided.  Thus, taking the challenged instruction in the greater context, it is clear that the charge given to the jury was not so erroneous that it could have misled them as to the

nature of the inquiry into whether murder or passion/provocation manslaughter was the correct

crime, and thus Petitioner is not entitled to habeas relief in this matter for either of his jury charge

related claims. *Duncan*, 256 F.3d at 203.


**2. Petitioner's claims that the trial court denied him Due Process by delaying the conclusion of his trial and in failing to ask the jury if further deliberations would help before sending them to deliberate on the final day of deliberations**

In his next series of claims, Petitioner takes issue with two instances in which the trial court

exerted its influence over Petitioner's trial – first when the trial court scheduled the trial in a

"disjointed" fashion – specifically by adjourning the trial for ten days because of the trial judge's

pre-scheduled vacation – and second when the trial judge requested that the jury in Petitioner's

trial make one final attempt at reaching a verdict when they indicated difficulties in achieving a

unanimous result. As to the first claim, that the trial court somehow denied Petitioner Due Process

when the trial had to be adjourned for ten days because of the trial judge's pre-scheduled vacation,

Petitioner has provided nothing but vague allegations that he was in any way prejudiced by the

delay. Because Petitioner has failed to present any evidence which would show that this delay in

his trial had a "substantial and injurious effect or influence in determining the jury's verdict," any

error on the part of the trial judge resulting from the ten day vacation delay was harmless and is

insufficient to warrant habeas relief.[4]  *See Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

---

[4] For the first time in his reply brief, Petitioner contends that this delay from the trial judge's vacation harmed his right to testify on his own behalf because he was "forced" to make the determination of whether to testify before the judge's vacation, rather than after all of the testimony other than his own had been taken. For reasons which are expressed below, it is clear that Petitioner was not denied his right to testify on his own behalf, and that counsel advised Petitioner of that right prior to and during trial, and thus there is no evidence to support the assertion that the delay at trial harmed Petitioner's right to testify on his own behalf. In any event, because this

Petitioner next asserts that he was denied Due Process when the trial judge asked the jury to make one last attempt at deliberations after they became deadlocked without first asking the jurors whether more time might alleviate the deadlock. Petitioner contends that this ran afoul of Due Process as it may have led to the jury reaching a conclusion it otherwise would not have reached because they may have perceived they would not have been permitted to leave without reaching a unanimous verdict. This assertion, however, patently ignores the statements the trial court made to the jury, which strongly suggest that the trial court was asking the jury to give deliberations one final attempt before he would declare a mistrial.

After four days of deliberation in this matter, the jurors informed the trial court that they were deadlocked and did not think a verdict could be reached. The Court then excused the jury for the night and instructed them to come back the following morning. (*See* Document 11 attached to ECF No. 7). When the jury returned the following day, the trial judge informed them that he would like them to continue deliberations for one more day. (Document 12 attached to ECF No. 7). To help in that endeavor, the trial judge gave them a supplemental instruction about their role and the conduct of deliberations, at the conclusion of that instruction, the trial court made the following statement: "I'm going to ask you to go back into the jury room and see if you can reach a unanimous agreement. If you can, fine. If you can't, then please notify us after you have endeavored to do so." (*Id.* at 4). The jury thereafter requested a rereading of the jury charge, after which they reached a unanimous guilty verdict. (*Id.* at 4-15). Based on this context – that the trial judge had already been told by the jurors that they didn't think they would reach a verdict and the trial judge thereafter instructing them to give one final attempt at deliberating before informing the

---

argument was raised for the first time in reply, the Court would be free to reject it for that reason alone, although the Court need not do so because Petitioner's claim that he was denied his right to testify on his own behalf is unsupported in the record. *See Judge*, 119 F. Supp. 3d at 284.

court that a verdict was impossible – the Appellate Division rejected Petitioner's argument because Petitioner had failed to present any evidence which would suggest that the trial court's actions improperly influenced the jury's verdict.  (*See* Document 23 attached to ECF No. 7 at 19).

As the Appellate Division noted in its opinion, the instruction given by the trial court specifically asked the jury, who at that point had been deliberating for only four, less than full, days, to make one final attempt at reaching a verdict.  The judge's comments directly stated that, if the jury could not reach a verdict that day, to notify the court, implying that the judge would excuse them and declare a mistrial should they not reach a verdict after one final day of trying. Given the context of this matter and the implication of the trial judge's comments that the jury need only make one final attempt at exhaustion, this Court concludes that Petitioner has failed to show that the trial court's direction that the jury make one final attempt at reaching a verdict had a substantial and injurious effect upon the outcome of the jury's deliberations, and Petitioner's claim must be denied as any error was harmless.  *Brecht*, 507 U.S. at 637.  In any event, Petitioner has presented no decision of the Supreme Court to which the state courts' decisions on this matter were contrary, nor that these decisions unreasonably applied, and this Court is aware of no such decision, and Petitioner would therefore not be entitled to relief for that reason as well.  *See* 28 U.S.C. § 2254(d).

### 3.  Petitioner's Ineffective Assistance of Counsel Claims

In his habeas petition, Petitioner presents several claims alleging that he suffered ineffective assistance of trial and appellate counsel.  The standard which applies to such claims is well established:

> [c]laims of ineffective assistance are governed by the two-prong test set forth in the Supreme Court's opinion in *Strickland v.*

*Washington*, 466 U.S. 668 (1984). To make out such a claim under *Strickland*, a petitioner must first show that "counsel's performance was deficient. This requires [the petitioner to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687*; see also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007). To succeed on an ineffective assistance claim, a petitioner must also show that counsel's allegedly deficient performance prejudiced his defense such that the petitioner was "deprive[d] of a fair trial . . . whose result is reliable." *Strickland*, 466 U.S. at 687; *Shedrick*, 493 F.3d at 299.

In evaluating whether counsel was deficient, the "proper standard for attorney performance is that of 'reasonably effective assistance.'" *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005). A petitioner asserting ineffective assistance must therefore show that counsel's representation "fell below an objective standard of reasonableness" under the circumstances. *Id.* The reasonableness of counsel's representation must be determined based on the particular facts of a petitioner's case, viewed as of the time of the challenged conduct of counsel. *Id.* In scrutinizing counsel's performance, courts "must be highly deferential . . . a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

Even where a petitioner is able to show that counsel's representation was deficient, he must still affirmatively demonstrate that counsel's deficient performance prejudiced the petitioner's defense. *Id.* at 692-93. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. The petitioner must demonstrate that "there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Shedrick*, 493 F.3d at 299. Where a "petition contains no factual matter regarding *Strickland's* prejudice prong, and [only provides] . . . unadorned legal conclusion[s] . . . without supporting factual allegations," that petition is insufficient to warrant an evidentiary hearing, and the petitioner has not shown his entitlement to habeas relief. *See Palmer v. Hendricks*, 592 F.3d 386, 395 (3d Cir. 2010). "Because failure to satisfy either prong defeats an ineffective assistance claim, and because it is preferable to avoid passing judgment on counsel's performance when possible, [*Strickland*, 466 U.S. at 697-98]," courts should address the

> prejudice prong first where it is dispositive of a petitioner's claims.
> *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002).

*Judge v. United States*, 119 F. Supp. 3d 270, 280-81 (D.N.J. 2015).


### a. Petitioner's claim that counsel failed to prepare his case and prepare him to testify at trial

In his first ineffective assistance claim, Petitioner asserts that his trial counsel failed to prepare for his case, failed to put on a proper defense on his behalf, failed to go over discovery with Petitioner, and failed in advising him whether to testify at trial. The state PCR courts rejected these claims based on the factual and credibility determinations made by the PCR judge following an evidentiary hearing. The factual findings of the state PCR court are entitled to considerable deference on habeas review. *See, e.g., Dennis v. Sec'y, Penn. Dep't of Corr.*, 834 F.3d 263, 281 (3d Cir. 2016). This Court can only reject a state court decision based on factual determinations where those determinations were "objectively unreasonable in light of the evidence presented in the state-court proceedings." *Id.* (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)). Such factual determinations are thus presumed to be correct, and should only be rejected upon a showing of clear and convincing evidence that the determination was unreasonable or incorrect. *Id.* At Petitioner's PCR hearing, his trial counsel testified that he frequently discussed Petitioner's case with Petitioner that they went over witnesses, trial preparation, and strategy together, and that they discussed the pros and cons of Petitioner taking the stand, including the likelihood that Petitioner would be impeached based on his criminal history if he chose to make the stand. The PCR judge found counsel's testimony to be more credible than that of Petitioner, and thus rejected Petitioner's claims that counsel failed to discuss with him discovery, trial strategy, and the witnesses against him based on the credible testimony of trial counsel. Because Petitioner has failed to provide clear and convincing evidence that these factual and credibility determinations were incorrect or

unreasonable, they are entitled to deference and must be presumed correct by this Court. Because this Court does not find the PCR judge's determinations to have been unreasonable in light of counsel's testimony at the PCR hearing that he and Petitioner discussed and went over the evidence at length, including discussions of cross-examination strategy and whether Petitioner should have taken the stand, those determinations require that the Court reject Petitioner's claim that counsel failed to prepare for trial with him.

The testimony of counsel, found credible by the state PCR judge, establishes that counsel did prepare the case with Petitioner, met with him and his family frequently, and used discussions with Petitioner to prepare for trial, and that counsel even considered Petitioner's input during jury voir dire and cross examination. That testimony also establishes that counsel discussed at length with Petitioner whether Petitioner should take the stand, and that Petitioner was specifically told that the decision of whether to testify was his alone. Trial counsel's testimony likewise indicates that Petitioner was given the chance to change his mind if he so chose at trial, and Petitioner elected not to testify. This testimony, coupled with the credibility findings of the PCR judge, establishes that Petitioner cannot show that his counsel performed deficiently in preparing him for trial and in advising him not to testify on his own behalf, and Petitioner is therefore not entitled to habeas relief on these bases. *Strickland*, 466 U.S. at 687

In addition to asserting that counsel prevented him from testifying by failing to properly advise him as to his right to make the decision to testify, Petitioner also makes the stand-alone claim that he was denied the right to testify on his own behalf. While the testimony of trial counsel during the PCR counsel, in combination with the PCR judge's factual and credibility determinations, indicates that counsel was not ineffective in advising him on whether to testify and informing Petitioner that the choice was his alone to make, the trial transcript also clearly

establishes that Petitioner was provided the opportunity to testify on his own behalf, and chose not

to do so, which effectively forecloses Petitioner's claim that he was denied the right to testify on

his own behalf.  Specifically, the following colloquy was conducted by trial counsel and the court

as to Petitioner's choice not to testify:

> [Banas]: [Petitioner], over the course of the trial of the past two weeks, have we discussed the possibility of you testifying in this case?
>
> [Petitioner]: Yes.
>
> [Banas]: You have been present for all the testimony that has been presented.  Is that correct?
>
> [Petitioner]: Yes.
>
> [Banas]: After hearing all of the testimony, and conferring with me, have you made a decision that you choose not to testify in your own defense?
>
> [Petitioner]: Yes.
>
> [Banas]: And the reasons for that is because of your prior criminal history?
>
> [Petitioner]: Yes.
>
> [Banas]: And also the prospect of the cross examination by the prosecutor.  Is that correct?
>
> [Petitioner]: Yes.
>
> THE COURT: [Petitioner], you have had sufficient time to discuss this with Mr. Banas?
>
> [Petitioner]: Yes.
>
> THE COURT: And without going into anything that would be discussed between you and Mr. Banas, did he answer all your questions concerning this decision?
>
> [Petitioner]: Yes.

THE COURT: Has anyone threatened you in any way or forced you in any way not to decide to testify?

[Petitioner]: No.

THE COURT: Now, you understand that this decision, at least as far as I'm concerned for this trial, is a final decision, you're not going to testify in this case?

[Petitioner]: Yes.

THE COURT: And you've had sufficient time to think about this decision. Is that correct?

[Petitioner]: Yes.

THE COURT: All right.

(Document 4 attached to ECF No. 7 at 95-96).

As this colloquy and the testimony of counsel at the PCR hearing establish, Petitioner was aware that the decision of whether to testify was his. He had the opportunity to weigh that decision against the risk of impeachment via his criminal history and the strength of the prosecution's case, and chose after full consultation with counsel not to testify. Thus, based on the factual record and the testimony of counsel, in combination with the PCR court's credibility determinations and the deference due those determinations, it is clear that Petitioner was not denied the opportunity to testify on his own behalf, and Petitioner's contention to the contrary, whether as a stand-alone claim or as a species of ineffective assistance claim, is without merit. The decision of the state courts to reject those claims was thus neither an unreasonable determination of the facts or applicable legal standards, and Petitioner is not entitled to habeas relief based on either counsel's preparation for trial or Petitioner's decision not to testify at trial.

**b. Petitioner's claim that counsel was ineffective in failing to object to a prosecution witness testifying while shackled and wearing prison garb**

Petitioner next asserts that his trial and appellate counsel proved ineffective in failing to object to a prosecution witness testifying in prison garb, including shackles. Petitioner also contends that the trial court erred by failing to *sua sponte* give a limiting instruction regarding the prison garb. In *Estelle v. Williams*, 425 U.S. 501, 504-05 (1976), the Supreme Court held that compelling a criminal defendant to testify while wearing prison garb had a negative effect upon the defendant's right to a fair trial as prison clothing and shackles could have a tendency to weaken the presumption of innocence in the eyes of the jury, and that requiring defendants to wear such clothing thus did not comport with Due Process. The principle chiefly motivating this determination by the court was the paramount importance of the presumption that all defendants are innocent until proven guilty, a presumption which does not apply to non-defendant witnesses in a criminal trial. *See Estelle*, 425 U.S. at 503-05; *see also Deck v. Missouri*, 544 U.S. 622, 630 (2005); *Green v. Warren*, No. 12-6148, 2013 WL 6865420, at *14 (D.N.J. Dec. 20, 2013). The Supreme Court has thus never extended this rule regarding the wearing of prison attire while testifying to non-defendant witnesses in a criminal proceeding. *Green*, 2013 WL 6865420 at *14.

Even if the *Estelle* rule did apply to witnesses, including witnesses for the State such as the one at issue here, any prejudice flowing from the wearing of prison garb by such a witness is rendered harmless where the witness testifies that he is a convicted prisoner because that testimony places his criminal status before the jury regardless of his attire. *See Green*, 2013 WL 6865420 at *14; *see also Stahl v. Henderson*, 472 F.2d 556, 557 (5th Cir. 1973) ("[n]o prejudice can result from seeing that which is already known); *United States v. Brooks*, 125 F.3d 484, 499 (7th Cir. 1997) (where even a defense witness testifies that she is a convicted prisoner, any possible

prejudice from the wearing of prison attire is dispelled by that admission). In this matter, one of the first pieces of testimony provided by the witness who testified at trial in prison garb and shackles was that he was currently in prison for a violation of parole flowing from a prior felony conviction. (*See* Document 2 attached to ECF No. 7 at 3-4). Because Wilson testified that he was a felon who was currently in prison, even if the *Estelle* rule did apply to him as a prosecution witness, Petitioner's claim would fail because his testimony prevented his testifying in prison garb from having a "substantial and injurious effect or influence in determining the jury's verdict," rendering any error related to his having worn prison garb and shackles harmless and insufficient to warrant habeas relief. *Brecht*, 507 U.S. at 637; *see also Strickland*, 466 U.S at 690-94 (requiring showing of prejudice for ineffective assistance claim). Thus, as a stand-alone claim that the trial court erred by permitting Wilson to testify in prison garb or by failing to give a limiting instruction regarding that attire, any error was harmless, and Petitioner cannot establish his entitlement to relief.

To the extent that Petitioner asserts that trial and appellate counsel were ineffective for failing to challenge the prison garb issue, his claim must fail because he suffered no prejudice as a result of that failing as Wilson testified that he was a felon. Thus, any aspersions Wilson's felon status may have cast on Petitioner as a friend of his existed regardless of the clothing Wilson wore, and the wearing of shackles and prison garb was equally harmless and thus incapable of establishing prejudice for the purposes of a *Strickland* claim. Likewise, to the extent that Petitioner asserts that counsel was ineffective in failing to challenge Wilson's attire based on state law, that claim, too, is foreclosed. As the Appellate Division explained to Petitioner during the appeal of his PCR petition, applicable state law at the time of Petitioner's trial, while broader than *Estelle*, applied the prison garb rule only to *defense* witnesses, and not to those called by the prosecution

such as Wilson. (*See* Document 34 attached to ECF No. 7 at 14-15). While the state courts have since extended the rule, at the time of Petitioner's trial there was no clear legal basis in New Jersey for an objection based on the wearing of prison garb or shackles by a prosecution witness, and counsel can therefore not be said to have been deficient in failing to presage the change in law to that effect several years *after* Petitioner's trial. (*Id.*). Because any prejudice arising from the wearing of the prison garb was rendered harmless by Wilson's own testimony, and because counsel cannot be said to have been deficient in failing to object to Wilson's attire based on the laws in effect at the time of Petitioner's trial, counsel cannot be said to have been ineffective. As such, the state courts' determination that Petitioner was not entitled to relief on the basis of either failure of the trial court to prevent or provide a limiting instruction based on Wilson's attire or based on counsel's failure to object thereto does not amount to an unreasonable determination of the facts or federal law. Petitioner is therefore not entitled to habeas relief on either of these claims.

### c. Petitioner's claim that Appellate Counsel failed to raise his PCR issues on direct appeal

Petitioner also contends that his counsel on direct appeal was ineffective for not raising the issues he raised during his post-conviction relief proceedings. While the *Strickland* standard applies to appellate counsel just as it does to trial counsel, *see Smith v. Robbins*, 528 U.S. 259, 285 (2000), "it is a well established principle . . . that counsel decides which issues to pursue on appeal," *Sistrunk v. Vaughn*, 96 F.3d 666, 670 (3d Cir. 1996), and appellate counsel need not raise every nonfrivolous claim a defendant desires to pursue. *Jones v. Barnes*, 463 U.S. 745, 751 (1983). Because the heart of effective appellate advocacy lays in winnowing out weaker claims in favor of those with a greater likelihood of success, *see id.* at 753; *Smith v. Murray*, 477 U.S. 527, 536 (1986), the Supreme Court has held that "[g]enerally, only when ignored issues are clearly stronger

24

than those presented, will the presumption of effective assistance of [appellate] counsel be overcome." *See Robbins*, 528 U.S. at 288 (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)).

Here, Petitioner asserts that his appellate counsel was ineffective for failing to raise the claims which he raised for the first time in his PCR petition, specifically his claims that he was prejudiced by the disjointed trial schedule, by the testimony of a state witness in prison garb, and Petitioner's having allegedly been denied his right to testify. As discussed above, all of these claims are clearly without merit, and it is therefore by no means clear that these issues were in any way stronger than those raised on direct appeal. Because these claims are without merit, Petitioner suffered no prejudice from counsel's failure to raise them on direct appeal, and the Appellate Division's conclusion to that effect in denying this claim on appeal from the denial of Petitioner's PCR conviction was neither an unreasonable application of the law or facts. *Robbins*, 528 U.S. at 288. Petitioner is therefore not entitled to habeas relief on this claim as his claim of ineffective assistance of appellate counsel is without merit.

**d. Petitioner's ineffective assistance claims regarding counsel's conduct in advance of the PCR hearing**

Petitioner attempts to raise two further claims in this matter which are related to his trial counsel's conduct – first, that trial counsel either proved ineffective or denied him Due Process on post-conviction relief when counsel failed to turn over Petitioner's trial file to PCR counsel when asked, and second, that trial counsel violated his professional duties when he spoke to the State in advance of the hearing on Petitioner's PCR petition. This second claim was raised for the first time in Petitioner's supplemental reply brief (ECF No. 16) and is therefore not properly before this

court and will be rejected for that reason.  *See Judge*, 119 F. Supp. 3d at 284.  Even if this claim

had been properly raised, Petitioner would still not be entitled to relief as counsel's conduct in

relation to a PCR proceeding cannot form the basis for habeas relief.  *See, e.g.,* 28 U.S.C. § 2254(i)

("The ineffectiveness or incompetence of counsel during Federal or State collateral post-

conviction proceedings shall not be a ground for relief in a proceeding arising under section

2254").  Likewise, as to Petitioner's claim that counsel lost his trial file, Petitioner has failed to

show any prejudice that resulted from his inability to access the file which was apparently lost by

his trial counsel.  Petitioner and his PCR counsel were more than capable of producing a PCR

petition containing numerous claims, and Petitioner has failed in any way to show that he has other

claims that he would have raised had counsel not failed to properly keep up with his file.  As such,

Petitioner has failed to show prejudice, either under *Strickland* to the extent he intended to raise

these claims as ineffective assistance claims, or sufficient to show that any error was not harmless

under the *Brecht* standard.  Petitioner has therefore failed to show that he is entitled to relief under

either of these claims.


**e.  Petitioner's cumulative error claims**

In his final two claims, Petitioner asserts that, even if his claims of either error by the trial

court or ineffective assistance claims are insufficient to warrant relief individually, Petitioner's

claims cumulatively establish either that he was denied due process or that he was denied the

effective assistance of counsel.  To the extent Petitioner asserts that the alleged claims of

ineffective assistance of counsel establish ineffective assistance cumulatively if not individually,

that claim is without merit for the reasons discussed above – Petitioner has failed to establish a

claim of ineffective assistance of counsel in any of the claims he has raised in this matter, and

those claims fair no better cumulatively. Petitioner has failed to show that counsel was deficient or that he suffered adequate prejudice, and his cumulative ineffective assistance claim must therefore be denied. *Strickland*, 466 U.S. at 687-94.

To the extent Petitioner claims that the alleged errors of the trial court raised in Petitioner's non-ineffective assistance claims cumulatively indicate that he was denied Due Process, that claim similarly must fail. Although errors "that individually do not warrant habeas relief may do so when combined,"

> a cumulative-error analysis merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless. Cumulative errors are not harmless if they had a substantial and injurious effect or influence in determining the jury's verdict, which means that a habeas petitioner is not entitled to relief based on cumulative errors unless he can establish actual prejudice.

*Albrecht v. Horn*, 485 F.3d 103, 139 (3d Cir. 2007) (internal quotations and citations omitted), *cert. denied*, 552 U.S. 1108 (2008). As with his ineffective assistance claims, Petitioner's other claims fair no better cumulatively than they do individually. Petitioner has failed to show that any of the alleged errors above had a substantial and injurious effect upon the jury's verdict, and, to the extent any of Petitioner's claims identify any errors at all, those errors were all clearly harmless for the reasons discussed above. Because Petitioner's claims, individually or cumulatively, fail to demonstrate any prejudice to Petitioner, Petitioner is not entitled to habeas relief, and his petition for a writ of habeas corpus must be denied. *Id.*

## III. CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. §2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of his state court conviction unless he has "made a substantial showing of the denial of a constitutional right." "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Because all of Petitioner's claims are either without merit or are otherwise insufficient to warrant habeas relief, Petitioner has failed to make a substantial showing of the denial of a constitutional right. As such, and because jurists of reason could not disagree with this Court's denial of Petitioner's habeas petition, Petitioner's claims are inadequate to deserve encouragement to proceed further and Petitioner is denied a certificate of appealability.

## IV. CONCLUSION

For the reasons stated above, Petitioner's petition for a writ of habeas corpus (ECF No. 1) is DENIED and Petitioner is DENIED a certificate of appealability. An appropriate order follows.

Dated: April 7, 2017

*s/Susan D. Wigenton*
Hon. Susan D. Wigenton,
United States District Judge